Good morning, your honors. I'm Norman Lustig, attorney for the plaintiffs and appellants in this matter. Before starting, I would like to reserve about five minutes of my time for rebuttal. All right. Watch the clock. I'm sorry? Watch the clock. Thank you. And I would like to assure Judge Hawkins that the absence of a request for administrative hearing was in no way related to a failure to deposit funds into a trust account. There are, as the court will note, some new and additional cases that I'd like to call to the attention of the court. First, the decision in Caloris v. Board of Trustees, the California Court of Appeal case, cited in the reply brief for the proposition that there can be a constructed de facto termination even if the employment relationship nominally continues, is now published at 105 Cal 4th, 1293. And the California Supreme Court denied review of that case on May 21st. So the decision is now final. At page 1318, the Court of Appeals stated, quote, we reject the notion that an abusive employer has the right to orchestrate how its employee exits her employment by demanding that the employee quit, close quote, or dots at that point, before acquiring a cause of action for wrongful constructive discharge. Accordingly, a de facto termination can occur under California law while an employee is still nominally on the payroll. Did either of your clients request a pre-termination hearing? No, Your Honor, they did not request a pre-termination hearing. Were they offered that opportunity? They were offered biased, which I'll go into, pre-termination hearings three and five months down the road after they were escorted off the premises by armed peace officers in a show, after a member of the Board of Supervisors held a press conference in which he announced to the public that they had been fired, and he generated, as indicated in the appendix, some rather lurid newspaper headlines, which went on day after day. I'd refer the Court to page 125 of the appendix, which is very lurid to read. Did either of your clients seek review by the California Civil Service Commission? There is no provision for they're not covered by California Civil Service. Okay. There's no provision for review outside of the county procedures, which they did not invoke for reasons that I'll go into. On June 6th, admittedly in the discrimination context, the 11th Circuit held in Bogle v. McClure No. 0213213 involving the Atlanta library system that a removal of significant duties in exile from a central office are sufficient to constitute a significant legal detriment even if pay continues at the same rate and titles are unchanged. On June 9th, the U.S. Supreme Court, in a unanimous decision in Desert Palace v. Costa No. 02679, held that to get a mixed motive instruction on sex discrimination to a jury, a plaintiff need not present direct evidence of discrimination. Merely a prima facie case to get that far. A rare unanimous affirmance of the 9th Circuit. A rare unanimous affirmance with Justice Thomas, I noted, as the author. Yes. Well, there was a concurrence. The plaintiff's neglected to cite two additional cases in the briefs, which I have given you a list, Bracey v. Gramley on the point that an interest in the outcome disqualifies a hearing officer and Zimmerman v. City of Oakland on the point that a post-deprivation hearing cannot obviate the need for a valid pre-deprivation hearing when a procedure is in place and is not utilized in a timely fashion. As Bracey held in part, due process requires not only, quote, a fair trial in a fair tribunal, but, quote, before a judge with no actual bias against the defendant or interest in the outcome of the particular case. Here, both of the pre-termination hearing officers had an interest in the outcome of the particular case because, as presented in the briefs and as I will argue further, their continued job retention was dependent on their firing these plaintiffs. That was stated. This case is yet another, is an unfortunate example of the arrogance of government toward the private property rights of individuals, an example of the philosophy that government can do no wrong, no matter how much individual rights are flouted, as long as the government provides an ostensible but meaningless administrative morass for the individuals to navigate long after, here, three and five months after, the real and final decisions have been made. The law does not support that position once the initial derelictions are severe, as in these cases. So your factual argument is that the offer of a pre-termination hearing was pretextual and, in any event, there was no real opportunity to obtain review of the decision. I am arguing that the decision was made when these people were thrown off the premises by peace officers in public and that their firing was announced to the press and appeared in headlines, which went on for weeks afterward. I'm arguing that there was an impermissible delay in offering a pre-termination hearing in a situation in which there was no pressing need to remove these people. This was not a situation where a felony had been committed. This was not a situation where they had committed a single wrongful act. This was a situation in which they were eventually accused of generalized administrative derelictions, such as not cooperating sufficiently with other agencies of the county. This was a show removal and a show trial. Further, the defendants demonstrate by their distortion of the objective factual situation in their written argument before this court their unease with the factual situation actually before the court. They seek, in effect, to charge sub-rows of the plaintiffs with purposefully ignoring a child in danger. That was certainly the image which they projected to the public in their intemperate and inappropriate public statements, but it has no basis in the record or in fact. As one indication of this, the defendants heavily censored and denigrated their opposition brief, the testimony of the witness, Kimberly Thomas, who supplied the smoking gun, that by the statement a defendant, member of the Board of Supervisors, member Thompson, both the County Administrator Johnson and the Department Director Rowe, the two respective pre-hearing officers were required by the Board of Supervisors to ensure that the plaintiffs were fired or they would be fired. They were both at-will political appointees, and they had no ostensible protections. The full testimony of that disinterested witness, as did Thompson's statement, is set forth in the record. Can any claim here that there's gender discrimination involved in this determination? Yes. And where did that come from? That came from the circumstances under which the plaintiffs were evicted from county premises. The defendants seek falsely to cast the position of the plaintiffs as being that the mere escort was gender discrimination. The discriminatory acts were a combination of publicly announcing that the plaintiffs' heads would roll first, then publicly and ostentatiously having the plaintiffs removed from the premises by a team of peace officers, and then by announcing to the press that the plaintiffs had been fired. So the gender? I'm sorry? How is that gender-related? Did they say something about the gender in all that? They did not say anything about the gender. Anything more to your claim than the fact these two claimants are female? I mean, certainly. Where does the discrimination because of gender get shown in the record? The record shows that no males, even those who stole from the county, were ever treated in any fashion remotely close to this. No males were even escorted by a civilian off county premises when they were told that they were terminated or suspended. Certainly not escorted off by police officers and having those suspensions announced to the public in the press. Well, the operation of that department was in the press, wasn't it? I beg your pardon? The operation of that department was already a news story in the press. The operation of that department was a news story. However, terminations of- Ongoing part of the story, I guess. Terminations, however, of individual due process protected county employees are not public matters. You mean in order for the public to learn of that, a reporter would have to have a chance to punish? I'm sorry, a reporter would have to have a chance to what? A reporter would have chanced upon that information. And if he learned it, could he publish it? A reporter who chanced on the information could publish it. Announcing it to the press is a very different thing. What's different about it? If the operation of that department was already an ongoing item in the news, controversial I gather, is it all right for the public official to say what's going on? Well, the public official said they were fired. They had not been given a pre-termination hearing. That's not all right. The county subsequently backtracked and said no, they- I thought it was making the announcement to the press was what was something that showed gender discrimination. Yes, it wasn't done with respect to males in comparable situations. You had comparable situations? It has never been done with respect to a male, and there have been males- Or female, have you? The record doesn't indicate with respect to other females. This is just the first time this has ever happened, and therefore it's gender discrimination. It raises an implication of that. I'm not agreeing that this is the first time it's ever happened. The record doesn't indicate one way or the other. We've got to go on. This is the first time that it has ever happened. Well, the record indicates that it has never happened to males. That's right. Who are in comparable situations. Or other females. The record doesn't indicate one way or the other with respect to other females. The burden is on you to show something. I mean, just because the record doesn't show it, we can't help you, can we? Well, the burden is to put a prima facie case forward that these people were in a protected category, that they were apparently performing their duties reasonably, that there was no reason to take the action taken at the time it was, and that people not in a protected category were not treated the same. Those are basically the McDonnell-Douglas criteria. The defendants in their brief also sought to obscure the circumstance that Johnson, as I said, conceded in his deposition that no male county employee had ever been escorted from county premises by even a civilian, much less a police officer, for any reason, whatever, political or otherwise. The defendants inaccurately stated in their brief that there was evidence that the plaintiffs indicated at the time of the disappearance that CPS had 10 days child protective services to investigate the anonymous report about the child, with the implication that the plaintiffs were uncaring bureaucrats who ignored a child in danger. There is specific evidence in the declaration of the plaintiffs that neither plaintiff so stated, either as individuals or on behalf of CPS. The only evidence which the county cites are unsupported vague declarations of defendants in Thompson that were objected to on the basis of lack of foundation and otherwise. Those objections are in the appendix. The defendants claim that the point that Parsons was foreclosed from raising the real reasons for her termination were not raised down below. Defendants should have read more closely. The points were raised in the oppositions down below at 12, page 12, 16 to 21, and page 13, 24 to 15, 5, which are in the appendix. The defendants regularly must state with respect to Parsons that there was a promise that defendant Johnson, whom the defendants conceded to have been involved in the terminations, would not be the hearing officer. However, they do not commendably perjure themselves on that. There was no binding promise that an opposing attorney could take to court on this matter. The county finally ineptly named Johnson or anyone in his total control as the hearing officer instead of giving the task to the State Office of Administrative Hearings, as suggested by the California Supreme Court in the case of Hospice County of San Bernardino, which is cited. As I've indicated, there was a prima facie case that the plaintiffs were treated differently on the basis of sex. And it was an inappropriate factual determination for the district court to decide that the events occurred solely for political reasons and would have occurred even if the plaintiffs were males. The plaintiffs were, in fact, de facto terminated when these expulsions occurred and weren't. Take to be a de facto termination. You've said that several times, but what does it take? The criterion is the same as for a constructive discharge under California law. That is, the circumstances of remaining or work are so distasteful that no reasonable person would undergo them, like being dragged out by peace officers, like having it announced to the public. Dragged out? Escorted out. Escorted out by peace officers. Uniquely, having it announced to the public that one was terminated in a matter which should be confidential in advance of a pre-termination hearing. They were, in fact, they were put on administrative leave, right? They were nominally put on administrative leave for three weeks. What does nominally mean? What does that mean? Well, it said that the disciplinary, the notice said that the disciplinary procedure had begun already. They have to go to work during this period of time? They were not. They were told to stay away. They were told. They didn't have to go to work. Were they paid? They were paid. Okay. Did it count as sick leave or something like that? It did not count as sick leave in those terms. Okay. So they were paid. They were put on paid administrative leave, right? That's correct. Okay. For three and five months with no pre-termination hearing at a time when they're. . . They got paid for three to five months and didn't have to go to work? I rather suspect that a judge who's escorted out by the police and paid for three or five months and it's announced that the judge is fired by the chief judge, would not think that that's the great deal that the court is implying it might be. Their reputations were totally sullied. They had to interact with members of the community who had the mistaken impression that they had done something wrong with respect to the missing child. Now. . . This was not a vacation in any sense. They were both offered a pre-termination hearing conducted by an officer from outside the county, correct? That's not true. Neither was. In the case of Parsons, the notice said that the hearing would be conducted either by Johnson, who was involved in her termination, or by someone named in Johnson's absolute discretion. From outside the county? The notice said nothing like that. But wasn't she told that the designee would be from outside the county? There was a statement made by the county council that the designee would be from outside the county. There's no statement that the designee would be impartial or chosen in an impartial fashion or chosen in the fashion that the California Supreme Court indicates in the Haas case is appropriate when there's any kind of conflict within the county. They were both told that they could appeal to the county civil service commission, right? No. There were two different procedures. The procedure for Parsons was that she had only a unitary hearing before Johnson or somebody in Johnson's absolute discretion. The procedure for Early, who was covered by civil service procedure, was that she first had the right to a pre-termination hearing before her supervisor, who had been threatened that if he did not fire her, he would be himself fired. So while a pre-termination hearing before a biased hearing officer may be permissible, and, in fact, it normally happens that a supervisor will conduct a pre-termination hearing, a pre-termination hearing before somebody who is not only biased but is totally rigid against even listening to what is said because he has a personal pecuniary interest in the outcome, that is, he will be fired. He has been told that by a member of the Board of Supervisors. That's the testimony that the Board that Kimberly Thomas quoted the member of the Board of Supervisors on. He is more than biased. He is unshakable in his position, and, therefore, it is not a valid pre-termination process. Did Thomas serve at the pleasure of the Board? I'm sorry? The supervisor of your client. Thompson? Yeah. Serve at the pleasure of the Board? The supervisor of my client was Rowe, who served at the pleasure of the Board, yes, and Johnson, who was the county administrator, served at the pleasure of the Board. So both of those administrators served at the absolute pleasure of the Board, and the quotation was that they would be gone if the clients were not gone. Now, the pre-termination hearing under both Homar and under Matthews v. Eldridge has to be given at an effective time in the process. The effective time in the process was before these people were escorted out in public and their terminations were announced. After that, the practice- When they were escorted out- I'm sorry? When they were escorted out, didn't the paper, well, as a matter of fact, I believe Early saw to it that the newspaper got the word because she brought a reporter with her when she came to get her termination or suspension letter, and the paper then reported that Rowe had authorized the temporary release of the plaintiffs and that whether they would return to their jobs was unknown and that the escorts were standard operating procedure, dismissals were not in a criminal nature. Is that correct? That's a later newspaper article. Yes, Monday morning. But there was a Sunday- After the Sunday paper had reported they had been fired. The Sunday paper reported they had been fired in that same account- Morning, Monday morning, they reported accurately that they had not been fired. Monday morning, another paper reported that they had been dismissed. Did I quote what the paper reported? Temporary release, whether they had returned to their jobs, unknown, and their escort out was standard operating procedure, didn't indicate that the dismissals had anything criminal in them. Two points on that. One was they didn't talk to the press until after the Sunday- First, did I quote that correctly? That paper you did quote correctly, yes. But the Sunday paper internally says, is this correct, that they had not talked to the press, that the press account in the Sunday paper was only based on what the member of the Board of Supervisors told- gratuitously told the press, which was that they had been terminated. Can I have the Court's indulgence for a few more minutes? Time is up, so you may get some rebuttal, you may not. So we'll hear from your opponent. Good morning or afternoon, depending on whether that clock is a minute right or faster on us. And if it pleases the Court. This case is really quite simple, and it's, as we indicated in our briefing before the Court, this is principally about procedural due process. The county had in place procedures that protected both of these individual employees. Those procedures are not challenged here in terms of their facial adequacy to protect the plaintiff's due process rights. They were offered the opportunity to appear at hearings. They refused that opportunity. That is the end of the case in a nutshell. The plaintiff's de facto termination theory is something that is heretofore unrecognized, certainly not in the context of a procedural due process case, where the question is whether or not there has been a deprivation of property without affording some sort of procedural protections. The case law is fairly clear that the merely placing an employee on leave with pay does not impact a property interest. There is a litany of cases to that effect. The pre-termination hearing required by the Supreme Court in Loudermill for public employees who are protected, as these two employees were, is a requirement that the hearing take place before the terminations go into effect. Indeed, that is precisely how this circuit in Walker v. City of Berkeley, a case that is cited to this court, characterized the Loudermill requirement. That is, Loudermill requires a hearing before the terminations go into effect. Was there some assurance in the process that the pre-termination hearing would take place before an independent person? Yes. And what form did that take? What occurred is that was a letter of speech. It was a meeting between plaintiff's counsel, Mr. Lustig, and the county counsel, Dennis Bunting. It was a meeting that followed soon after they were placed on paid administrative leave. In that meeting, Mr. Bunting informed Mr. Lustig, according to Mr. Bunting's declaration that is in the record, and that is not contested, that with respect to Ms. Parsons, that Ms. Parsons' hearing would be conducted by an individual designated by the county administrative officer from outside the county. The reason for that is there is a difference between the two types of procedures that applied to the two different plaintiffs. Ms. Parsons was a management-level employee. As a management-level employee, she was only entitled to one shot and one shot only. So the sort of truncated, louder mill, in California they refer to it as a Skelly hearing, which is based upon a California case. Some of you may not be familiar with the terminology, Skelly versus State Department of Personnel. But that Skelly hearing-type requirement where you go before your boss, your appointing authority, wouldn't be sufficient because, with respect to Parsons, there was no post-termination remedy available to her. So the county administrative officer or plaintiff's counsel was informed during this meeting that the CAO would designate somebody from outside the county to hear Ms. Parsons' claim. As to Ms. Earley's claim or potential appeal, her first level of appeal would go before Don Rowe, who was her appointing authority. That is what the civil service rules provide. That is all that the law requires. Again, in Walker v. City of Berkeley, the Ninth Circuit really could not have been clearer, and it was in accordance with multiple other circuits, that your initial pre-termination hearing, you are not entitled to where there is a post-termination remedy available. You are simply not entitled to an unbiased hearing officer. And there are several reasons for that. First of all, it creates an unworkable situation where the very person who is often the one who makes the decision, this person ought to be fired, is the person who is going to be the one conducting that initial pre-termination hearing. If the suggestion is that that person has to have some level of provable neutrality, if you will, every single case under the well-accepted standards as they exist today would be before the federal judiciary because you would always be able to say, well, that person had an emotional interest, a vested interest in seeing to it that I'm fired, and therefore they're not sufficiently unbiased in my pre-termination hearing, therefore violated my due process. You talked about your brother's contention that the hearing officer would have been under a duty to fire them or lose his own job. Was that shown? First of all, I don't... Does that make a difference? One, I don't believe it makes a difference under the current standards in the case law. As to Early, at least. Yes, as to Valerie Early. As to Edith Parsons, yeah, it would make a huge difference because that was her one and only shot. Because there's, again, no requirement for an unbiased hearing officer. Second, I don't believe that the record adequately supports that accusation. The deposition testimony of Kimberly Thomas that is the source of this allegation is somewhat equivocal. In her deposition testimony, it can be read in different ways, but what she essentially says is, my impression was that the board of supervisors member who was speaking to us was telling us that there was a process whereby he would bring pressure on the CAO and Don Rowe, who was the head of the Department of Social Services, and that her impression was that if the plaintiffs weren't fired, that the CAO and Don Rowe's job would be at risk. And she even used in her testimony, she used the words, these are my words. So it's somewhat unclear. If that in and of itself was a critical issue in the case in terms of whether or not there was, or that, if that's a tribal issue of fact, perhaps then that would be sufficient to go to jury. I don't believe that that is because the state of the law is not, doesn't require Don Rowe to be unbiased. And one has to recall that she's entitled to a hearing before a civil service commission where she will be eventually entitled to call witnesses on her own behalf, subpoena witnesses, cross-examine witnesses. The appointing authority, Don Rowe, will bear the burden of proof to justify her termination. There's nothing in this record, frankly, that suggests that had they gone to the civil service commission, that the county would have had a strong case against them. They may very, I mean, there's a good chance that they may very well have won before the civil service commission and fairly early and have her job here today. Well, going back to Ms. Parsons, this assurance about bringing somebody in from the county came in a meeting. Yes. Was there any more, I read that declaration, but it's been a while. Anything more to the assurance than that the hearing officer would be from outside the county? That was as far as the assurance went? That was at least as what is supported in the record. That is the extent of the assurance. There's only one other place in the record that references that particular comment or conversation, and it's a letter from Mr. Lustig's office to Mr. Bunting asking Mr. Bunting to write a return letter. In that letter, Mr. Lustig references the statement that there would be place, or I believe that he references the statement that there would be a hearing officer from outside the county. But that's the extent of the record on that. There's no further assurances, but there doesn't need to be a further assurance. In order to prove bias. Whose burden is it? Do you have to prove bias or unbiased? They have to prove bias, and the law is absolutely clear on that. The Supreme Court withdrew created a pretty tough burden to show that they would have to show bias on behalf of some unnamed person from some unnamed county. Is that enough, do you think? Or would they have to wait until the person was named and then attack the bias? The latter. That's part of the problem with the case is that they deprived both themselves and this court of the opportunity to even question who the hearing officer would be and whether or not that hearing officer would be imbued with sufficient bias to justify not participating in the hearing. There's nothing that suggests that had a county administrative officer gone and I can't think of an appropriate hypothetical, but gone and obtained somebody that would be clearly tainted with bias and used that person as a hearing officer that the plaintiff or Ms. Parsons would then not be justified saying, I don't have to part. That's a sham. That would be an unnecessary waste of time. Therefore, I'm not going to participate in that hearing process. And under those circumstances, she might be able to bring a procedural due process claim. But the U.S. Supreme Court, both in Withrow and then later in the Horton Joint Unified School District case, makes abundantly clear that in a case such as this, somebody who is trying to avoid the requirement of participating in an administrative process and who is claiming that they were denied the procedural protections that would be facially available to them on account of bias, bears the burden of overcoming a strong presumption with substantial evidence that the hearing officer in question was biased. It is not enough that the hearing officer may or may not have engaged in the investigation that led up to the proposed discipline. There must be evidence of some either pecuniary interest, personal animosity, or some pre-decision by the hearing officer. And there simply is no evidence to support that contention in this case. And that really is the nudge of the entire case because plaintiffs, I think if you break down their de facto termination theory, it really boils down to an allegation that the decision-making process had come to the point where it was so concrete that it would be futile for the plaintiffs to have participated in the administrative proceedings. Futility in this arena is one of the arguments that is often made and rarely successful, principally because of the Withrow-Horton presumption. Just to move on for a brief moment, the gender discrimination claim is simply wanting of merit for multiple reasons. First of all, there is no evidence of an adverse employment action that would justify a gender discrimination claim. So the prima facie test fails at that point. All we know is that there was media attention attendant to their being placed on leave. The media attention largely centered around the Zeana Fairchild disappearance. What's interesting, though, is if you closely read the press accounts, and by the way, in looking at these press accounts, it's clear to me that this is an example of sloppy journalism that somehow has made its way into a claim before this court because there's a lot of statements that say that Supervisor Silva confirms X, yet you go on to read the quotation from what Supervisor Silva says, and it's not that whoever wrote the article, it's not anything like what they're supposedly confirming. But the press accounts, their focus on the Zeana Fairchild matter is in discussions with the principals, i.e., the family of the victim and members of a foundation that was created by the family members of the victim who were interviewed or appear to have been interviewed by these reporters. The quotations attributed to the county personnel were all very clear. The Zeana Fairchild matter played a very small role in this. They say that it is not the reason or the sole reason that these two individuals were removed from their jobs. Supervisor Silva is quoted as saying that his concern about the Zeana Fairchild was CPS's response to it, that is, it appeared cavalier to him, and that is in the record, that his concern was to their response, not necessarily that they had done something wrong in that individual case. Don Rowe, in one of the articles, is quoted, or has a quote attributed to him, I should say, as saying that this decision is not related to any particular case or any particular single event. So there isn't anything even, the county personnel can't even be accused of connecting that up. So the press attention does not justify a finding of some kind of constructive termination. And besides, to find a constructive termination, they had to have left their jobs, their employment. Whatever the California Court of Appeals may or may not have said, this court, in the Draper case, does say, although it's cited in our briefs and I'll be candid, it is not a case that really addresses the issue of what a constructive termination is. It is a continuing violation case. But it does say that a constructive termination occurs when there is a termination of the employment as a result of harassing and abusive behavior. And no such termination occurred here until they chose not to forego their administrative remedies. And what's critical about this is there's nothing in the record, there's not even an argument that's being made that the decision not to proceed forward with their administrative remedies was in any way reflected by or caused by this notion that they were subjected to all this harassment and it would be an intolerable working environment. Their arguments are all, we didn't participate in the administrative hearings because we thought that they were biased and we wouldn't get a fair shake. And they had simply failed in that particular burden of proof. Merely being escorted out to one's automobile is not a sufficiently material detrimental impact to their employment to constitute an adverse job action for discrimination purposes. That would leave them, which is not argued here, that would leave them effectively for a Title VII claim with a sex harassment claim. And there's no facts to support the kind of severe pervasive behavior to justify a claim under those grounds. And that's not even, that hasn't been argued. Plaintiff's counsel didn't directly address the Roth claim, which is the liberty interest claim. I'll just address it very briefly. In order to sustain a claim for deprivation of a liberty interest without due process, you have to show some sort of public accusations of seriously stigmatizing information of a nature that impugns the credibility or the honesty, the character and the morality of the employee. Here there's no evidence of that. All there is is evidence, and candidly inadmissible here, say, because it's all in the form of published press accounts. But the only evidence is that there were statements that the press attributes to the effect that at most these two plaintiffs, as managers of their department, could be accused of having mismanaged that department, even grossly mismanaged that department. That's not sufficient. The law is clear. This circuit in the Lohr case makes that clear as well as several other cases. So there really isn't a Roth claim. And besides, they were entitled to a name-clearing hearing, the same procedural protections that would have been available to them to protect their property interests. With a minute 46 left, if there are any questions the Court would like me to address, I will. I guess not. Thank you. Thank you. We'll give you one minute in rebuttal. I would like to address the liberty issue in rebuttal. The Spear case from the Eighth Circuit sets forth a liberty standard. If public officials are unwise enough to shoot off their mouths to the press, they have to assume the responsibility that the quotations may not be exactly accurate. However, the record- If a public official chooses to shoot off his mouth to the press, they assume the risk that they might not be correctly quoted. Yes. If they do it when they are- That's what the Spear case says. I would commend it to you. But let me go on to one additional point. In the appendix, there are reporters' transcripts saying they wrote exactly what they were told. They're in the appendix before the Court. They were told that these people were fired on that day. Now, the liberty implication here is that these people were fired publicly in a context in which it was attributed to their derelictions with respect to the disappearance of a missing child. That is a reflection on their character. Thank you. Thank you. The case just argued will be submitted, and we'll stand in recess for the day.
judges: Hill, Tg Nelson, Hawkins